AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | Case No.  5:22-mj-00376-DUTY |
| AUSTIN DANGER ELLISON-MEADE, | |
| Defendant | |

LODGED
CLERK, U.S. DISTRICT COURT
6/10/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
6/10/2022
CENTRAL DISTRICT OF CALIFORNIA
BY:   bm      DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 24, 2019 in the county of San Bernardino in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Phyllis M. McLean*
_____
*Complainant's signature*

Phyllis M. McLean, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    June 10, 2022

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Jean Rosenbluth, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Monica E. Tait

## AFFIDAVIT

I, Phyllis M. McLean, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2021. I am currently assigned to a Complex Financial Crime squad of the FBI's Los Angeles Field Office, which is responsible for investigating corporate and securities fraud, including mail fraud, wire fraud, securities fraud, and insider trading.  My training included 21 weeks of FBI Special Agent Training at the FBI Academy in Quantico, Virginia.  Before becoming a Special Agent, I worked within the FBI as an Investigative Specialist from 2013 to January 2021.  As an Investigative Specialist I conducted surveillance and prepared written surveillance documents.  Additionally, I obtained a Bachelor of Science degree in Criminal Justice from Murray State University, Kentucky, in 2010.

2.    In addition to my formal training and personal experience, I have learned from and worked alongside numerous senior FBI agents with years of experience in investigations of various fraud crimes, including, but not limited to, corporate and securities fraud, mail fraud, wire fraud, securities fraud, and insider trading.  As a result of my training and experience

in investigating fraudulent schemes, I have become familiar with the types of records and documents that individuals and entities use to perpetrate their schemes, and I have participated in the execution of search warrants at homes and businesses of individuals involved in fraudulent schemes.

## II. PURPOSE OF AFFIDAVIT

3.   This affidavit is made in support of a criminal complaint and arrest warrant for AUSTIN DANGER ELLISON-MEADE ("MEADE") for wire fraud in violation of 18 U.S.C. § 1343.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and amounts are approximate.

## III. STATEMENT OF PROBABLE CAUSE

5.   To date, my investigation has shown that MEADE, a resident of San Francisco, California, orchestrated a fraud scheme in which he made false representations and employed forged documents to convince investors to invest in MEADE's

investment club called BAYCAP.IO ("BAYCAP").  MEADE represented
to investors that MEADE had created an algorithm designed to
successfully pick stocks to trade in the stock market.  MEADE
repeatedly claimed he would use investors' money to buy and sell
stocks.  After they invested, MEADE sent to some investors
forged brokerage statements, purportedly from third-party stock
brokerage firms, and/or fraudulent reports from BAYCAP, each
purporting to show that the investors' funds were being invested
as MEADE represented and were earning substantial positive
returns.  Encouraged by these documents, some investors sent
MEADE additional funds for investment.

6.   MEADE repeatedly told investors their investments were
doing well and provided regular updates indicating positive
returns.  Instead, bank records obtained by the FBI during this
investigation show that MEADE did not trade stocks with
investors' funds as he had promised to do, but rather spent much
of the investors' money to pay for MEADE's personal expenses,
including the purchase of watches and apparel, luxury car
leases, and substantial expenses at restaurants.  When investors
notified MEADE that they wished to withdraw some or all of their
investments, in most instances MEADE did not comply, and instead
made multiple excuses for why the withdrawals were delayed.  To
further MEADE's scheme and hide the truth from investors, MEADE
falsely claimed that a third party, the relative of a scheme

victim, was assisting him with executing withdrawals from the investment fund, and used an email account MEADE created to impersonate that person for the purpose of communicating further excuses as to why investors were unable to obtain their funds.

7.   Based on the facts set forth below, there is probable cause to believe that MEADE has violated 18 U.S.C. § 1343 (wire fraud).

**A.   BACKGROUND ON MEADE**

8.   MEADE is 24 years old.  Based on interviews with victims and records checks, I believe MEADE currently lives in the San Francisco, California area, and lived there during most of the events described in this affidavit.  Victims S.C. and K.S., discussed below, were both located in the Central District of California.

**B.   S.C. SENT APPROXIMATELY $486,000 TO MEADE BETWEEN 2019 AND 2020 SO THAT MEADE COULD TRADE STOCKS WITH THE MONEY VIA BAYCAP**

9.   I have learned the following from my own interviews of S.C. and S.C.'s spouse, K.C., my review of documents S.C. and K.C. provided to the government, and my review of bank records I obtained:

a.   S.C. of Huntington Beach, California, was the Chief Executive Officer ("CEO") of a specialty pharmacy company. S.C. knew MEADE before the events of this affidavit because

MEADE was friends with, and used to share an apartment with, S.C.'s son, C.C.

b.   During a dinner meeting before S.C. invested, MEADE told S.C. and K.C. that MEADE's investment club, BAYCAP, would make investments like a hedge fund by buying and selling stocks in the stock market.  MEADE said investments would perform like day trading in the stock market.

c.   On September 28, 2019, MEADE sent a text message to S.C. saying "I just sent you the partner partner shop [sic] agreement so you can read over it[.]"[1]  I have reviewed the BAYCAP Partnership Agreement signed by S.C. and MEADE.[2] According to the agreement, "The only purpose of the partnership is to invest the assets of the partnership solely in publicly traded individual corporate stocks and bonds, and mutual funds and ETF's (Exchange Traded Funds) made up of those investments, for the education and benefit of the partners."  The agreement stated that there was a 2% capital fee for each capital contribution, and that the managing partner (who was not identified by name) would receive 20% of the profits each quarter as compensation.  S.C. and K.C. confirmed to me that

---

[1] In the quotes of MEADE's communications set forth in this affidavit, I have maintained all typographical and grammatical errors.

[2] The effective date of the agreement is May 29, 2019.  I have reviewed similar agreements signed by others who have indicated they invested with MEADE, and I observed that many of the partnership agreements carry the same effective date.

they believed the funds they entrusted to MEADE would be used to trade stocks.  S.C understood MEADE would receive a portion of the profits made on investments as compensation.

> d.    According to K.C., S.C., and screenshots I have reviewed from K.C. showing the contact details on both K.C.'s and S.C.'s phones, MEADE used phone number (541) 261-4956 to communicate with S.C. and K.C.

> > i.    According to subscriber records received from Verizon, I know phone number (541) 261-4956, which MEADE used to communicate with S.C. and other investor victims, was registered to MEADE from as early as March 2019 through at least January 4, 2022.

> e.    I have reviewed text messages S.C. and K.C. provided between S.C and MEADE, including one on September 30, 2019, when MEADE texted S.C., "Hey so I setup [sic] an account for you and [K.C.][.]"  Thereafter, on October 1, 2019, S.C., who has told me he was then located in the Central District of California, ordered $115,000 to be wired to MEADE's personal JP Morgan Chase Bank account ending in 7161 (the "7161 Account"). Of this first $115,000 payment, $15,000 was intended as an investment for S.C. and K.C's son (C.C.).  Bank records I reviewed show this wire was made using the Fedwire system.  I know from information provided by the Federal Reserve Bank of New York to another FBI Special Agent that since 2009, funds

transferred via the Fedwire Funds service were processed through locations in Texas and New Jersey.

f.    Shortly after S.C. sent his first wire, MEADE reported that S.C.'s investment had increased in value.  For example, on October 15, 2019, MEADE texted S.C., "Your balance without [the portion attributed to C.C.'s $15,000 investment], is 127,280[.]"

g.    On December 30, 2019, MEADE texted S.C., "You're at 193k btw[,]" indicating to S.C. that the first investment had risen substantially in value.  S.C. responded, "Sweet!! I'll do wire today or tomorrow for 200k[.]"  That same day, S.C., from the Central District of California, ordered $200,000 to be sent to the 7161 Account, as an additional investment with MEADE for the purpose of stock-trading.  Bank records I reviewed show this wire was made using the Fedwire system.

h.    On March 11, 2020, MEADE texted S.C., "We're making so much fucking money this week[.]" MEADE continued, "We're up 8% for the week[.]"

i.    On April 6, 2020, S.C., from the Central District of California, ordered $15,000 to be sent via Fedwire to the 7161 Account, as an additional investment with MEADE for the purpose of stock-trading.  Bank records I reviewed show this wire was made using the Fedwire system.

j.   On April 13, 2020, S.C. texted MEADE, "How did we do based on 400k?"  MEADE responded, "21%[.]"  S.C. messaged MEADE, "So off 400k we made $84k ?"  MEADE responded, "Yep[.]" That same day, S.C., from the Central District of California, ordered two additional payments of $100,000 and $56,000 to be sent via Fedwire to the 7161 Account, as additional investments with MEADE for the purpose of stock-trading.  Bank records I reviewed show these wires were sent via the Fedwire system.

k.   On June 30, 2020, S.C. texted MEADE to ask about withdrawing some of S.C.'s funds.  On July 2, 2020, MEADE texted S.C. to notify him a withdrawal was not possible, saying "Yeah so it's too late for this quarter and the reason it's strict is cause of long term vs short term capital gains[.]"

l.   On September 14, 2020, S.C. texted MEADE, "Friendly reminder to please check my balance today so I can let you know how much we would like to withdraw[.]"  MEADE responded by text, "2,246,724[.]"

m.   On October 13, 2020, MEADE, using the email address Austin.meade@icloud.com, emailed S.C. a pdf document purporting to be an overview of S.C.'s BAYCAP account at Interactive Brokers.  K.C. provided me with a copy of this document.  It purports to be an "Activity Statement" from Interactive Brokers for September 1-30, 2020.  Under "Account Information," the "Name" stated was "Baycap.io" and the

"Account" was listed as "UXXXXXX" followed by S.C.'s name.  The statement listed an ending balance of approximately $2,632,709.

       i.  On December 17, 2021, I interviewed a Compliance Manager from Interactive Brokers, which is a brokerage firm through which investors can trade stocks.  I had asked him to review the September 2020 statement S.C. had received from MEADE.  The Compliance Manager determined the statement was not an authentic Interactive Brokers document.  He also observed that all BAYCAP accounts at Interactive Brokers had been closed in 2019,[3] and that a person whose name matched S.C.'s name had an account at the brokerage, the account was located in the United Kingdom, and it was not presently funded.  (S.C. informed me on May 28, 2022 that S.C. has never had an Interactive Brokers account in his own name other than the account he believed he had through MEADE.)

       n.  On October 29, 2020, S.C. texted MEADE asking for an update on receiving funds.  MEADE responded, "Talked to the broker.  It will with 100% certainty go out sometime tomorrow.  Sorry about the delay it's because we switched brokers in the middle of the withdrawal period and there was some confusion.  Since it's getting sent tomorrow depending on the time it gets

---

[3] As discussed below, records I obtained from Interactive Brokers show that MEADE did not successfully activate a BAYCAP account there, but had a personal account at the brokerage firm, which was closed by September 2019.

sent it will either arrive tomorrow or Monday." S.C. did not receive any funds.

o.   On November 11, 2020, S.C. texted MEADE again and asked for the balance details of his account. MEADE responded, "Your number is $3,412,112.13 as of the 30th[.]" Two days later, MEADE emailed S.C. an October 2020 brokerage statement purportedly from Charles Schwab claiming to describe an account in the name of S.C. and BAYCAP, account ending 6437. The statement listed the ending value on October 31, 2020 to be $3,412,112.13.

i.   On January 21, 2022, I contacted Charles Schwab Legal Services by email to obtain information regarding the document MEADE provided to S.C. I attached the purported October 2020 brokerage statement to the email to Charles Schwab Legal Services. A Charles Schwab employee responded on January 25 and 26, 2022, and indicated that Charles Schwab had no record of the account identified on the statement MEADE had sent.

p.   As of May 6, 2022, S.C. and K.C. had invested $471,000 with MEADE on their own account. MEADE has not returned any of these funds, nor any of the purported increase in value MEADE claimed they had earned.[4]

---

[4] As noted above, S.C. and K.C. also sent MEADE funds totaling $15,000 for their son C.C.'s investment account with MEADE. According to C.C., MEADE has paid C.C. $70,000 from C.C.'s purported investment with MEADE. According to C.C., MEADE also gave C.C. a Christsmas gift of more than $20,000 towards the purchase of a car for C.C. beginning in December

*(footnote cont'd on next page)*

**C.   K.S. SENT APPROXIMATELY $200,000 TO MEADE IN 2019 SO THAT MEADE COULD TRADE STOCKS WITH THE MONEY VIA BAYCAP**

10.  I have learned the following from my own discussions with K.S. and my review of documents K.S and other investors provided to the government, as well as bank records I obtained:

a.   K.S., a resident of Highland, California, within the Central District of California (San Bernardino County), was S.C.'s friend and co-worker.  K.S. learned of MEADE's investment algorithm through S.C.  K.S. was initially skeptical of the investment, but was impressed when S.C. showed K.S. a BAYCAP statement, which showed S.C.'s investment had tripled in value over time.

b.   K.S. never met MEADE in person.  He spoke to MEADE about three times by phone, and primarily communicated with MEADE by text messages and sometimes through email (including with the email address austin.meade@icloud.com). K.S. does not remember exactly how his first contact with MEADE concerning the investment discussed below was arranged, but he indicated that MEADE used phone number (541) 261-4956 to communicate with K.S.

i.   Records I obtained from Apple, Inc. indicate that the name associated with the account

_____

2019 (including funds paid from the 7161 Account traceable to investor contributions).  C.C. did not work for MEADE or BAYCAP, nor did he manage or control any investor funds.

austin.meade@icloud.com is "Austin Ellison-MEADE" and that the account was created on March 24, 2012.  The Apple records also indicated that the phone number for Austin.meade@icloud.com was 541-261-4956, MEADE's Verizon phone number.  The Apple ID for Austin.meade@icloud.com was another email, austindangerem@gmail.com; according to information from Google LLC ("Google") described below, this is another email address associated with MEADE.

c.    MEADE told K.S. that MEADE had invented a trading algorithm, which MEADE would use to purchase and sell stocks for BAYCAP.  MEADE told K.S. the trading algorithm had a built-in safety net to stop trading so an investor could never lose more than 10% of the investor's investment on any given day.  MEADE said he was confident K.S.'s BAYCAP investment account would generate approximately 16-20% in returns because MEADE's historical average returns were approximately 16-20%.  MEADE said he would receive a 2% management fee on investments.

d.    On December 18, 2019, MEADE sent K.S. a text message saying "Hey [K.] it's Austin. Just sent you the agreement via DocuSign[.]"  K.S. agreed to invest with MEADE and executed a BAYCAP Partnership Agreement via DocuSign on December 23, 2019.[5]  According to the agreement, which I have reviewed,

---

[5]  According to www.docusign.com, DocuSign is a service that facilitates the collection of electronic signatures, among other services.

"[t]he only purpose of the partnership is to invest the assets of the partnership solely in publicly traded individual corporate stocks and bonds, and mutual funds and ETF's (Exchange Traded Funds) made up of those investments, for the education and benefit of the partners."  On December 24, 2019, K.S., from the Central District of California, ordered $200,000 to be sent to the 7161 Account for the purpose of stock-trading with MEADE. Bank records I reviewed show this wire was made using the Fedwire system.

11.  According to documents provided by K.S. I have reviewed, on February 13, 2020, MEADE sent K.S. via text message a BAYCAP invoice dated February 13, 2020, purporting to show K.S.'s January 31, 2020 investment balance to be $243,647.60, with a return on investment of $47,647.60 for the month of January.  An excerpt of this document is reproduced below:
//



Even though the above document was labeled an "invoice," as if funds were due from K.S. to BAYCAP, based on K.S.'s communications with MEADE and the document's reference to a balance and an "ROI" (return on investment) for the month of January, K.S. understood that this document was not an invoice, but rather a report describing the current value of K.S.'s investment with MEADE and BAYCAP.

      a.   On March 11, 2020, MEADE texted K.S., "[K.S.] we're making sooooo much money this week[.]"  MEADE further added, "Feb was 14.61%[.]"

      b.   On or around April 12, 2020, MEADE texted K.S. an April 13, 2020 BAYCAP document in a format similar to the one

excerpted above, purporting to show K.S.'s investment balance at
$358,296, with a growth of $114,648 since February 13, 2020.

       c.   On August 28, 2020, MEADE texted K.S. an August
1, 2020 BAYCAP document in a format similar to the one excerpted
above, listing K.S.'s investment balance at $635,468.74 with
approximately $113,651.74 in earnings for July 2020.  Based on
documents from K.S. that I have reviewed, by at least September
14, 2020, K.S. began to ask MEADE for withdrawals of some of
K.S's funds.  On October 28, 2020, K.S. sent MEADE a text
message saying K.S. never received a wire for the withdrawal
(previously requested) of money from K.S.'s BAYCAP account.
MEADE replied to K.S. by text message on October 28, 2020 and
said "I'm calling the broker at 5am cause 8am east coast
time[.]"  On November 12, 2020, K.S. sent another text message
to MEADE regarding not receiving the withdrawal from K.S.'s
investment account.  MEADE replied to K.S. by text on November
12, 2020, "Hey [K.],I had ¼ clients who hadn't received money
yet have funds post today, I have a call in the morning with the
broker to know what's going on[.]"  On November 16, 2020, K.S.
texted MEADE for an update on the withdrawal.  MEADE responded
to K.S. by text saying "Our attorneys are just handling it since
it's taken so long[.]"  MEADE continued, "I sicked them on the
broker this morning to get us some quick resolution[.]"

12.  Despite his multiple requests, as of May 9, 2022 (the last time I spoke with him), K.S. had not received any of K.S.'s investment back from MEADE.

### D.   MEADE DID NOT INVEST S.C OR K.S.'s MONEY IN STOCKS, BUT INSTEAD SPENT MOST OF IT FOR HIS OWN PURPOSES

13.  From my review of records and information I obtained from Charles Schwab, I learned that MEADE had two accounts at Charles Schwab, both under MEADE's own name.  MEADE's application identified his email address as AUSTIN.MEADE@ICLOUD.COM and his mobile phone number as 541-261-4956 (the same email and phone he used to communicate with S.C., K.S., and other investors).  Based on the records I obtained, neither account appeared to have any stock-trading activity at all.  Charles Schwab did not have any record of accounts in the name of BAYCAP, nor Baycap Crypto Holdings LLC (a company Meade established in May 2021, discussed below).

14.  From my review of records and information I obtained from Interactive Brokers, I learned that MEADE opened one account at Interactive Brokers in his own name on April 19, 2018, and this account was closed on September 20, 2019 (i.e., before either S.C. or K.S. invested with MEADE).  Interactive Brokers' records show that on April 9, 2019, MEADE attempted to open an account at Interactive Brokers in the name of BAYCAP, but the account was never activated due to MEADE's failure to respond to Interactive Brokers' request for more documentation.

MEADE used austin.meade@icloud.com to communicate with
Interactive Brokers regarding the attempted activation of the
BAYCAP account.

15.   Based on my review of bank records obtained during
this investigation, I learned the following:

a.   I have obtained and analyzed bank and credit card
records for MEADE, including the 7161 account to which S.C. and
K.S. sent the funds described above.   MEADE was the sole
signatory on the account, and he identified his phone number as
(541) 261-4956, the same number he used to communicate with
S.C., K.S., and other investors.

b.   Based on my review of the transactions in the
7161 account, I saw no indication that the funds S.C. and K.S.
transferred to the 7161 Account were used to purchase stocks or
engage in day-trading activity as MEADE represented.   I have
also interviewed at least two other investors whose investment
funds were deposited into the 7161 Account between April 2019
and March 2020 for purposes of stock-investing via MEADE.   As
with the S.C. and K.S. funds, there is no indication from my
review of the bank records that those other investors' funds
were used to purchase and trade stocks.

c.   The records from the 7161 Account do show
transfers to companies I have since identified as car
dealerships, jewelers, luxury apparel companies, restaurants,

and credit card companies, among other transferees.  I have obtained records from many of these transferees, in part to document MEADE's use of S.C.'s and K.S.'s investment funds. These records show MEADE spent a substantial portion of the money S.C. and K.S. sent him to support MEADE's lavish lifestyle, a trip on a private jet, an expensive watch, and expensive restaurants.  For example:

i.   As stated above, on October 1, 2019, S.C. wired $115,000 to the 7161 Account for the purpose of investing in stock-trading.  The balance in the 7161 Account the day before the deposit was approximately $501.72.  During the month of October 2019, there were other deposits into the 7161 Account totaling $390,574.88, but none of these deposits came from any company I recognize to be a stock brokerage firm.  Instead, based on information I obtained from interviews with other investors, review of documents they provided, and financial institution records, I believe these deposits came from other investors in MEADE's investment scheme.  Below is an example of MEADE's use of the investor funds:

(I)  a $1,943 debit card payment on October 3, 2019 for a purchase at Eleven Madison Park.  According to its website, this is a restaurant in New York;

(II) a $3,484 debit card payment on October 4, 2019 for a purchase at Tiffany & Co. for diamond jewelry;

(III)    a $14,208 debit card payment on October 7, 2019, for a purchase at "Rolex Boutique New York – presented by Wempe" for an 18-karat rose gold/stainless steel Rolex wristwatch;

(IV) a $9,175 debit card payment on October 6, 2019 to Yves Saint Laurent, which included the purchase of:

(A)  a pair of $595 sneakers;

(B)  a $4,990 women's jacket;

(C)  $740 worth of jewelry; and

(D)  a $2,850 handbag;

(V)  a $2,003 debit card payment on October 6, 2019, for a purchase at Louis Vuitton;

(VI) a $1,929 debit card payment on October 6, 2019, for a meal at Eleven Madison Park, which included the purchase of a $690 bottle of wine; and

(VII)    a $47,263 debit card payment on October 7, 2019, for a purchase at Monarch Air Group LLC, a private jet charter company.

ii.  As stated above, on December 24, 2019, K.S. wired $200,000 to the 7161 Account for the purpose of investing in stock-trading.  The balance in the 7161 Account the day before the deposit was approximately $6,579.74, meaning most of the funds in the account thereafter were from K.S.  The only other significant deposit into the account between December 24,

2019 and January 3, 2020 was a wire of additional investment funds from victim S.C. on December 30, 2019 for $200,000.  Below is an example of MEADE's use of the investors' funds:

        (I)  a $30,000 wire on December 24, 2019 to M. Ellison, whom I believe to be MEADE's relative;

        (II) an approximately $20,393 payment on December 27, 2019, toward the balance of a Capital One Credit Card in the name of J.W.; based on information I have received from victims who know MEADE's family, I believe this person is MEADE's stepfather;

        (III)   a purchase of approximately $24,500 worth of alcohol on December 28, 2019, at a Miami nightclub; and

        (IV) a $35,000 payment on January 2, 2020, to Butler Ford, an Oregon-based auto dealership.

        iii. As stated, above on April 13, 2020, S.C. sent two wires of $100,000 and $56,000 to the 7161 Account for the purpose of investing in stock-trading.  The balance in the 7161 Account the day before the deposits was approximately $2,826, meaning most of the funds in the account thereafter were from S.C.  Below is an example of MEADE's use of the investor's funds:

(I)   On or around April 13, 2022, an $82,500 down payment to Evan Paul Auto Leasing LLC for a 2017 Lamborghini Huracan, for which the total price was $184,143.

**E.   MEADE'S AGGRAVATED IDENTITY THEFT TO FURTHER HIS SCHEME TO DEFRAUD**

16.   I have learned the following from my own discussions with K.S. and my review of documents K.S and other investors provided to the government:

a.   On September 14, 2020, K.S. texted MEADE and requested to withdraw some money from K.S.'s account with MEADE. MEADE instructed K.S. to email MEADE at Austin.meade@icloud.com with the exact details.  On October 13, 2020, after K.S. had not received his money, K.S. again texted MEADE to attempt to make a withdrawal.  On October 14, 2020, MEADE told K.S. by email, "[t]he money from your trading account has being [sic] withdrawn from trading as of today."  Again, K.S. did not receive any funds from MEADE as promised, and K.S. continued to follow up regularly.

b.   On December 15, 2020, K.S. contacted MEADE again regarding receiving funds.  MEADE texted K.S. on December 15, 2020 and indicated that MEADE's "partner" was helping MEADE regarding withdrawals.  (As discussed below, I have interviewed the person MEADE has claimed was his partner (the "ID Theft Victim"), who told me he is the son of another investor, and was

not MEADE's partner.)  MEADE identified soulrcarroll@icloud.com

as the email address for MEADE's purported partner (the

"Imposter Email Address").  That same day, K.S. emailed MEADE's

purported partner at the Imposter Email Address and asked for an

update concerning K.S.'s withdrawal of funds.  The next day,

December 16, 2020, someone used the Imposter Email Address to

respond to K.S.'s email, stating in part "[a]pologizes [sic] for

the delay, essentially what happened is when we changed

brokerage there was a mixup with the dates"  The email closed by

stating "Thanks, [ID Theft Victim's name]" as if the ID Theft

Victim had written the email.

    i. Subscriber records I have reviewed from

Apple, Inc. ("Apple") show that the first name and last name

identified for the Imposter Email Address match those of the ID

Theft Victim.  The Imposter Email Address is a "login alias" for

the Apple ID identified as danger198backup@gmail.com.  I know

from my training and experience and review of documentation

issued by Apple that an Apple ID is an authentication method

used by Apple for iPhone, iPad, Mac, and other Apple devices.

The Apple ID consists of an email address and a password.  An

Apple login alias is an alternate account identifier that is

associated with the Apple product and the user.  The Imposter

Email Address and its Apple ID were created on September 11,

2020.  MEADE's phone number (541) 261-4956 is the verified phone

number for the Imposter Email Address and is the only phone number associated with the Imposter Email Address.

        ii.  According to Apple login records for the Imposter Email Address and its Apple ID, the account was logged into on September 11, 2020 from Internet Protocol ("IP") address 73.189.44.37.  Other records from Apple show that on the very same day, MEADE's account Austin.meade@icloud.com (which he used to communicate with investors and others) was logged into using the same IP address.

        iii. I reviewed subscriber records from Google regarding danger198backup@gmail.com, the Apple ID associated with the Imposter Email Account.  According to Google, the account was registered to MEADE in his own name on July 3, 2013, and listed austindangerem@gmail.com as the recovery email address.  I have also reviewed subscriber records from Google regarding austindangerem@gmail.com.  Google records indicate the subscriber for the austindangerem@gmail.com account was "Austin Danger."  According to a copy of MEADE's California driver's license I reviewed, which was provided to Coinbase, a cryptocurrency exchanger, to open an account in MEADE's name, MEADE's first name is listed as "Austin Danger" and his last name as "Ellison-Meade."  In addition, Google customer information billing records for austindangerem@gmail.com reflect MEADE as the account holder and reference the 7161 account.

17.  I interviewed the ID Theft Victim multiple times in 2022, and have reviewed documents he supplied to me.  He advised

me that he invested with MEADE on behalf of his mother, signing as her power of attorney and investing her funds for her benefit. The ID Theft Victim told me he never used or created the Imposter Email Address. He also told me that because MEADE wanted the ID Theft Victim to assist MEADE with the BAYCAP investment Club, the ID Theft Victim caused an employment contract to be drafted for that purpose to cover his potential work with MEADE. MEADE signed the contract, but the ID Theft Victim never executed the contract. The ID Theft victim maintains that he was never MEADE's partner and he never worked for MEADE.

### IV. <u>MEADE IS CONTINUING TO SOLICIT INVESTMENTS</u>

18. MEADE may be transitioning to offering a cryptocurrency-related investment offering. On September 29, 2021, I interviewed D.H., a Los Altos, California resident and learned the following from this interview and my review of bank records:

a. In or about 2019, D.H. invested $200,000 by wiring funds to MEADE for the purpose of stock-trading. Based on statements and information D.H. subsequently received from MEADE, he believed his investment increased in value.

b. Later, MEADE told D.H. about a cryptocurrency investment opportunity with MEADE. MEADE claimed to have a separate cryptocurrency investment account with an unidentified broker. As a result, in approximately May 2021, D.H. sent another $100,000 to MEADE based on representations MEADE would

use the funds to purchase cryptocurrency.[6]  D.H. later learned that other investors had accused MEADE of fraud, and he demanded his last $100,000 be returned, but MEADE did not return the funds.

19.  I learned the following from my review of publicly available documents filed with the California Secretary of State ("CA SOS"):

a.   On May 19, 2021, Baycap Crypto Holdings LLC ("BCH") filed its registration with the CA SOS, with MEADE listed as the sole name associated with the company (as organizer).

b.   On April 16, 2022, BCH filed a Statement of Information with the CA SOS that listed the type of business as "Asset Holding."  MEADE was listed as "Manager or member" and the agent for service of process.  The statement listed the name of a third party, A.A., as an additional "Manager or member" but A.A. name was crossed-out (or printed in strike-through type).  A.A.'s electronic signature appears on the April 16, 2022 CA SOS Statement of Information.

## V.  CONCLUSION

20.  For all the reasons described above, there is probable cause to believe that on or about December 24, 2019, within the

//

_____

[6]  D.H.'s funds were sent to a Bank of America account for which MEADE is the sole signatory.  Based on my review of the account records, I did not see evidence that these funds were sent to a cryptocurrency exchange.

Central District of California, AUSTIN DANGER ELLISON-MEADE

committed a violation of 18 U.S.C. § 1343 (wire fraud).


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>10th</u> day of
June, 2022.

_____
UNITED STATES MAGISTRATE JUDGE